## Nos. 25-1343, 25-1344, 25-1345

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; THE CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs - Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health,

*Defendants - Appellants.*

On Appeal from the United States District Court for the District of Massachusetts

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

*(Counsel listed on next page)*

BRETT A. SHUMATE
  *Assistant Attorney General*

BRIAN C. LEA
  *Deputy Associate Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

COURTNEY L. DIXON
JEFFREY E. SANDBERG
  *Attorneys*
  *U.S. Department of Justice*
  *Civil Division, Appellate Staff*
  *950 Pennsylvania Ave. NW, Rm. 7214*
  *Washington, DC 20530*
  *(202) 305-1754*

  *Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ..................................................................... 4

I.  The District Court Lacked Jurisdiction Over Plaintiffs' APA
    Claims. .................................................................... 4

II.  The Supplemental Guidance Is Lawful. ............................. 14

    A.  The Supplemental Guidance Is Consistent With Both HHS
        Regulations And Annual Appropriations Riders. ...................... 14

    B.  The Supplemental Guidance Is Reasonable And Reasonably
        Explained. ............................................................. 22

    C.  Plaintiffs' Remaining APA Challenges Are Without Merit. ........ 25

CONCLUSION .................................................................. 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ................................................................. 11

*American Sci. & Eng'g, Inc. v. Califano*,
    571 F.2d 58 (1st Cir. 1978) ...............................................................6, 13

*Baylor Univ. Med. Ctr. v. Heckler*,
    758 F.2d 1052 (5th Cir. 1985) ............................................................. 26

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ................................................................2, 5, 8, 11

*Brighton Vill. Assocs. v. United States*,
    52 F.3d 1056 (Fed. Cir. 1995) .........................................................10, 11

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) ........................................................................... 21

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ............................................................. 5

*Department of Educ. v. California*,
    145 S. Ct. 966 (2025) .......................................................................2, 5, 8

*Department of the Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ........................................................................... 14

*Diaz-Valdez v. Garland*,
    122 F.4th 436 (1st Cir. 2024) .............................................................. 25

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .........................................................................22-23

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................... 22

*FDA v. Wages & White Lion Invs., LLC*,
    145 S. Ct. 898 (2025) ........................................................................24, 27

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ............................................................................. 4

*Garland v. Ming Dai*,
    593 U.S. 357 (2021) ................................................................. 25

*Glidden Co. v. Zdanok*,
    370 U.S. 530 (1962) ......................................................9-10, 12

*Katz v. Cisneros*,
    16 F.3d 1204 (Fed. Cir. 1994) ...........................................10, 11

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...........................................................28, 29

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................. 22

*Martin v. Hadix*,
    527 U.S. 343 (1999) ...........................................................27, 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................. 5

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .............................................6, 12

*Molina v. INS*,
    981 F.2d 14 (1st Cir. 1992) ...................................................... 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... 22

*National Cable & Telecomms. Ass'n v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009) ................................................ 28

*National Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010) ................................................ 29

*Roberts v. United States*,
    242 F.3d 1065 (Fed. Cir. 2001) ............................................... 13

*St. Christopher Assocs., L.P. v. United States*,
    511 F.3d 1376 (Fed. Cir. 2008) ................................................. 9

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) ............................................8, 13

*United States v. Neifert-White Co.*,
  390 U.S. 228 (1968) ................................................................. 8

*United States v. Toth*,
  33 F.4th 1 (1st Cir. 2022) ...................................................... 26

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) ................................................................. 9

*Up State Fed. Credit Union v. Walker*,
  198 F.3d 372 (2d Cir. 1999) .................................................. 6

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 553(a)(2) ......................................................... 3, 25
  5 U.S.C. § 702 ...................................... 2, 5, 11, 12, 13, 29
  5 U.S.C. § 704 ....................................................................... 11
  5 U.S.C. § 706 ....................................................................... 27

21st Century Cures Act, Pub. L. 114-255, §§ 1001((b)(3)(B), 1002(b)(3)(B),
  1003(b)(3)(B), 1004(c), 130 Stat. 1033 (2016) ............................ 21

Pub. L. No. 118-47, div. D, tit. II, § 224,
  138 Stat. 460, 677 (2024) ...................................................... 15

2 U.S.C. §§ 683-684 ................................................................. 21

28 U.S.C. § 1491(a)(1) .............................................................. 4

**Regulations:**

2 C.F.R. § 200.414(c) ................................................................ 14

45 C.F.R. § 75.2 ....................................................................... 17

45 C.F.R. § 75.414(c) ...................................................... 15, 16, 17

45 C.F.R. § 75.414(c)(1) .............................. 14, 15, 17, 18, 19, 26, 28

45 C.F.R. § 75.414(c)(1)(ii) ...................................................... 17

45 C.F.R. § 75.414(c)(3) ................................................ 14, 15, 19, 26

45 C.F.R. § 75.414(c)(4)  .................................................................... 18

45 C.F.R. pt. 75, app. III, § C.7.a. ................................................... 18

45 C.F.R. Pt. 75, app. III, § C.8.a.  ................................................. 19

**Other Authorities:**

*Deviation*, Black's Law Dictionary (12th ed. 2024)  ........................................ 16

Matthew H. Solomson, *Court of Federal Claims: Jurisdiction,
Practice, and Procedure* (2016) ........................................................... 10

## INTRODUCTION AND SUMMARY OF ARGUMENT

This litigation arises from an effort by the National Institutes of Health (NIH) to achieve a longstanding goal: to establish new contract terms for research grants to institutions of higher education (IHEs) that rein in spending on indirect costs—also known as "facilities and administrative" costs—that have increasingly displaced NIH's ability to fund direct medical research. Under the revised terms set forth in the Supplemental Guidance, NIH will employ a standard indirect-cost rate of 15% for "any new grant issued[] and for all existing grants to IHEs," which will apply "for go forward expenses from February 10, 2025 forward." ADD.84. By limiting such overhead, NIH seeks to ensure that as much taxpayer funding as possible goes towards direct research. ADD.83.

Despite their many dozens of pages of collective briefing, plaintiffs do little to grapple with the errors made by the district court and addressed in our opening brief.[1] As an initial matter, plaintiffs do not seriously contest that the "policy" they challenge (States Br. 31; IHEs Br. 25) is in essence a uniform contractual amendment adjusting the terms of IHEs' grants with NIH. Plaintiffs nonetheless continue to insist that, despite the contractual character

---

[1] Briefs are cited as follows: Opening Brief for Defendants-Appellants (NIH Br.); Brief for Plaintiffs-Appellees in No. 25-1343 (States Br.); Brief for Plaintiffs-Appellees in Nos. 25-1344 & -1345 (IHEs Br.).

of this dispute, their case should be deemed to fall within the waiver of sovereign immunity in Section 702 of the Administrative Procedure Act (APA). As the Supreme Court recently recognized when staying a similar injunctive order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), Section 702's waiver does not apply where, as here, the dispute is essentially contractual so that the Tucker Act impliedly precludes relief under the APA. Virtually all of the arguments made by plaintiffs—including their primary reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988)—were also made by the plaintiffs in *Department of Education*, and they should be rejected here just as the Supreme Court rejected them there.

On the merits, plaintiffs likewise repeat the district court's erroneous reasoning without meaningfully engaging with our explanations of error. As explained, far from violating the governing regulations or appropriations riders reaffirming the same, NIH's action directly implements those regulations. Plaintiffs' contrary arguments reflect plaintiffs' own wishes for what those regulations and statutory riders might have said, not their actual text.

NIH's action is also reasonable and reasonably explained. The agency offered multiple reasons for adopting a standard 15% indirect-cost reimbursement rate for IHEs, including that indirect costs are difficult to oversee, are far in excess of indirect-cost rates paid by private sector funders,

2

and are crowding out funding in direct medical research.  In so doing, NIH acknowledged IHEs' reliance interests in the prior regime.  Plaintiffs' suggestion that NIH should have given an even fuller explanation finds no footing in the APA's minimal requirements.

NIH's Supplemental Guidance did not require notice and comment. The APA expressly exempts "matters relating to ... grants[ and] contracts" from rulemaking, 5 U.S.C. § 553(a)(2), and in any event, NIH's Guidance was action under an existing regulation, not the promulgation of a new one.  And though it is not a proper function of courts under the APA to hold agencies to past promises to undertake gratuitous rulemaking, HHS has now withdrawn its policy of voluntary notice and comment, so disturbing the Supplemental Guidance would now serve no logical purpose.

Finally, the IHE plaintiffs persist in arguing that the Supplemental Guidance was impermissibly retroactive without responding to NIH's explanation that the district court confused retroactivity with reliance interests. Again, the Supplemental Guidance addresses only "go forward" expenses. ADD.84.  To the extent the IHEs' retroactivity arguments add anything to this case, it is yet more evidence of the fundamentally contractual nature of this dispute.

**ARGUMENT**

## I.  THE DISTRICT COURT LACKED JURISDICTION OVER PLAINTIFFS' CLAIMS.

**A.**  "Sovereign immunity is jurisdictional," and "[a]bsent a waiver, [it] shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Under immunity principles, Congress controls not only whether and in what forum the United States may be sued, but also what kinds of relief are available for particular kinds of claims.

In many instances, Congress in authorizing suit against the United States has allowed for declaratory and injunctive relief but not for money damages. For contracts, though, it is the opposite.  The Tucker Act allows money "judgment[s] upon any claim against the United States founded ... upon any express or implied contract," and it vests exclusive jurisdiction in the Court of Federal Claims when the amount at issue exceeds $10,000.  28 U.S.C. § 1491(a)(1).  But the Tucker Act generally does not permit a court to order specific performance of contracts or impose other equitable relief, as plaintiffs acknowledge (*e.g.*, States Br. 27).

The threshold—and ultimately dispositive—question on appeal is whether a plaintiff contractor can evade Congress's choice not to authorize equitable relief for contractual claims against the government by instead filing suit under the APA.  The answer is no.  Plaintiffs exclusively rely on APA

4

Section 702, which provides "a limited waiver of sovereign immunity for claims against the United States" that seek "'relief other than money damages.'" *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). But that same waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The purpose of that carve-out, the Supreme Court explained, is to "prevent[] plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

As our opening brief explained, that important carve-out recently led the Supreme Court to stay a similar injunctive order in *Department of Education v. California*, a case likewise involving changed government policies relating to grants. 145 S. Ct. at 966-68. The Court acknowledged, citing *Bowen v. Massachusetts*, 487 U.S. 879 (1988), that Section 702 generally waives immunity for equitable claims even if "an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968. But in nonetheless granting the government's stay application, the Supreme Court concluded that Section 702's immunity waiver "does not extend" to circumventing limitations on relief available under the Tucker Act. *Id.*

As previously explained (NIH Br. 25-36), that same reasoning applies here. The "source of [plaintiffs'] rights"—and basis for their Article III standing—is their existing contracts with NIH. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Plaintiffs allege that they "negotiated indirect cost rates" and "executed agreements" (J.A. 38) and that the Supplemental Guidance "constitute[s] a breach of the NIH's obligations" under those agreements (J.A. 30-31). "In the absence of [their] contract[s] with [NIH], therefore, 'it is likely that no cause of action would exist at all.'" *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 376-77 (2d Cir. 1999) (per curiam).

Similarly, as to "type of relief sought," *Megapulse*, 672 F.2d at 968, plaintiffs seek an order whose legal and practical effect is to require adherence to preexisting contractual terms compelling the payment of money. Plaintiffs' own briefing says so: "if the Notice is vacated, the negotiated rates for indirect costs will remain in effect rather than the Notice's 15% rate," thereby "result[ing] in defendants paying money to plaintiffs after they submit invoices for reimbursement of research costs." States Br. 24-25. The "essence" of this dispute is thus "in contract," and plaintiffs "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978).

**B.**  Plaintiffs' response briefs identify no error in that analysis.  In particular, plaintiffs do little to address the intervening decision in *Department of Education*, other than to try to "distinguish[]" it based on facts that the Supreme Court did not even mention (*see, e.g.*, States Br. 30) or the stay posture in which it arose.  But those assertions hardly diminish its value in addressing a jurisdictional question directly analogous to the one presented here, as other courts have recognized (*see, e.g.*, NIH Br. 34 n.4).  And there is nothing "ironic" (IHEs Br. 23-24) about the government asking this Court to apply the Supreme Court's reasoning consistent with the scope suggested by its decision.

Notably, plaintiffs' briefs reiterate the same series of arguments made by the State plaintiffs in *Department of Education* and that were necessarily rejected by the Supreme Court in granting a stay.  Plaintiffs argue that the source of their rights is "statutory and regulatory violations," States Br. 15, but so did the *Department of Education* plaintiffs.  *Cf.* Opposition to Application at 22-24, *U.S. Dep't of Educ. v. California*, No. 24A910 (U.S. Mar. 28, 2025) (*Education* Opp.).  Plaintiffs argue that they are challenging a "broadly-applicable policy" rather than individual contract actions, States Br. 31, but that was also asserted in the Supreme Court case, *cf. Education* Opp. 22 ("[t]he States challenge a programmatic decision").  Plaintiffs argue that they do not seek "compensatory relief" or "an order directing NIH to pay past due sums"

7

(States Br. 22; IHEs Br. 18), but again so did their counterparts, *cf. Education Opp.* 24 (similarly arguing that the States did not "'seek specific sums already calculated, past due, and designed to compensate for completed labors'"). And plaintiffs here—like there—argue that their claims must be allowed to proceed under a broad reading of *Bowen*. *Compare* States Br. 22-24, *and* IHEs Br. 22, *with Education* Opp. 21. Plaintiffs fail to explain why arguments that the Supreme Court recently rejected should lead to a different result here.

While plaintiffs emphasize that *Department of Education* "cited *Bowen* as good law," States Br. 31, they thereby draw the wrong inference. The Supreme Court granted a stay because *Bowen* did not control. As plaintiffs concede, *Bowen* had no occasion to consider "'contracts or grant agreements'" (States Br. 23), so general statements in *Bowen* "cannot be taken as a decision upon a point which the facts of the case did not present," *United States v. Neifert-White Co.*, 390 U.S. 228, 231 (1968). *Department of Education* shows that the Court was aware of *Bowen* but did not view its general language as holding that district courts may order equitable relief in contractual cases falling within the Tucker Act. *See* 145 S. Ct. at 968; *accord, e.g.*, *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1127 (Fed. Cir. 2007) (discussing *Bowen* and emphasizing that it "'linked its judgment to a specific set of circumstances' that are not present in most cases").

**C.** Plaintiffs' other related contentions fare no better. Plaintiffs mistakenly assert that the district court did not "construe any contract terms in reviewing the[ir] claims" (States Br. 13). But the regulations on which plaintiffs rely—and whose text the district court indeed "construe[d]"—were incorporated into their grant agreements. When plaintiffs allege a breach of regulations incorporated into a contract, they allege a breach of contract. *See St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (recognizing that "statutory or regulatory provisions" may be "incorporated into a contract" and thus support Tucker Act claims).

In any event, the determination whether a plaintiff has a Tucker Act claim, or instead APA claim, does not turn narrowly on the question whether the parties have an interpretive disagreement about a particular contractual term. Plaintiffs can and do bring Tucker Act contract claims against the United States even absent such interpretive disputes. For example, in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), the Court of Federal Claims (and, ultimately, the Supreme Court) adjudicated the government's liability for breach of contract when Congress enacted a statute that vitiated banks' contractual rights to specific regulatory treatment. The fact that plaintiffs' claims here likewise require reference to statutes or regulations does not oust the Court of Federal Claims of jurisdiction. *Cf. Glidden Co. v. Zdanok*, 370 U.S.

530, 557 (1962) (plurality op.) (recognizing that Court of Claims enjoys broad "freedom ... to inquire into the legality of governmental action," even as it awards only "damages, not specific relief").

Plaintiffs' protestation that "[n]one of the statutes and regulations upon which plaintiffs rely contains any mandatory compensation provision," States Br. 19, underscores this misunderstanding. All agree that the Court of Federal Claims may exercise jurisdiction not only for contract claims but also for claims premised on another money-mandating source of law. *See* Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, and Procedure* chs. 4-5 (2016). But that the Claims Court's jurisdiction extends beyond contract in no way diminishes its authority over contract claims themselves. Tucker Act jurisdiction embraces all claims "founded ... upon ... contract," 28 U.S.C. § 1491(a)(1), regardless of whether the plaintiffs asserting those claims also rely upon statutes and regulations to support their theories of breach. *See, e.g.*, *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059 n.3 (Fed. Cir. 1995) (rejecting contrary dicta from prior decision and reaffirming that Claims Court "retain[s] jurisdiction over contract actions 'founded upon statute, rules, and regulations.'").[2]

---

[2] That rejected contrary dicta had appeared in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), on which plaintiffs rely (States Br. 20, 24). As *Brighton*

*Continued on next page.*

Plaintiffs likewise veer off course in asserting that the Tucker Act's damages remedy would be "inadequate" to redress their claimed harms. States Br. 15-16, 28, 29. That assertion confuses distinct concepts: Section 702's limitation on the APA's waiver of immunity for nonmonetary relief, and Section 704's cause of action for review of agency action "for which there is no other adequate remedy in a court," 5 U.S.C. § 704.

Only Section 702 is at issue here, and unlike Section 704, the Section 702 analysis does not consider the adequacy of an alternative remedy. On the contrary, the essential purpose of Section 702's concluding proviso is to ensure that the APA cannot be used as an end-run around Congress's intended limitation on the scope of relief allowed under other immunity-waiving statutes, such as the Tucker Act. As relevant here, that means that "the Tucker Act 'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.'" *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004). The very point

---

*Village* explained, the *Katz* majority's holding ultimately rested on the fact that the plaintiff there was not "in privity with the Government" and so could have had no contract claim. *Brighton Vill.*, 52 F.3d at 1059. And the relevant dicta in *Katz* reflected an overreading of *Bowen* that departed from the "consistent[]" decisions of other circuits and the Claims Court's own precedent. *Id.* at 1059 n.3.

that plaintiffs most emphasize—that they seek "relief that the Court of Federal Claims lacks authority to grant," IHEs Br. 18—is in fact a reason why Section 702 bars their effort to proceed under the APA. *See Megapulse*, 672 F.2d at 967 ("[A] plaintiff whose claims ... are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings ... under the APA.").

Plaintiffs are also wrong to suggest that enforcing Section 702 would produce an "intolerable jurisdictional void" contrary to the "presumption of judicial review." States Br. 29; *accord* IHEs Br. 26. Judicial review remains available. If and when NIH withholds any higher indirect-cost payments, jurisdiction would lie under the Tucker Act to determine whether that withholding was a breach of contract and, if so, to award money damages. The presumption of judicial review helps to ensure a judicial forum but does not guarantee availability of a plaintiff's preferred remedy. To conclude otherwise would be to contravene longstanding immunity principles and, indeed, raise "serious ... questions" (IHEs Br. 26) about whether courts have arrogated to themselves a power that rightfully belongs to Congress. *Cf. Glidden*, 370 U.S. at 557 ("No question can be raised of Congress'[s]" constitutional authority to limit the "remedial powers of a federal court" by allowing only "damages, not specific relief[.]").

Plaintiffs also fail to advance the analysis by asserting that they seek review not only as to current NIH grants but also as to hypothetical "future grants for which no contract [yet] exists."  IHEs Br. 18.  Plaintiffs may not evade the Tucker Act by bringing an unripe claim involving grants that do not yet exist, and plaintiffs have not established Article III standing to challenge the government's treatment of such future grants.  But even if plaintiffs could seek review as to such future grants, it does not follow that plaintiffs then also may challenge the Supplemental Guidance as applied to current grants clearly falling within the scope of the Tucker Act.

At bottom, plaintiffs rely on their own say-so that they seek "classic APA remedies" providing "specific relief" rather than "specific performance" or other contract remedies.  States Br. 22; IHEs Br. 22.  But Section 702 does not allow plaintiffs to plead their way into their preferred forum.  The Court "must look to the true nature of the action," *Roberts v. United States*, 242 F.3d 1065, 1068 (Fed. Cir. 2001), and if its "essence" is "in contract," plaintiffs "cannot 'by the mystique of a different form of complaint' make it otherwise," *American Sci. & Eng'g*, 571 F.2d at 63.  "[D]ressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction and make it an APA case." *Suburban*, 480 F.3d at 1124.  And any lingering doubts about Section 702's scope cut against—not in favor—of plaintiffs' position.  *See*

13

*Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (immunity waivers are "strictly construed ... in favor of the sovereign").

## II.    THE SUPPLEMENTAL GUIDANCE IS LAWFUL.

If this Court reaches the merits, it should reverse each of the district court's erroneous rulings.

### A.    The Supplemental Guidance Is Consistent With Both HHS Regulations And Annual Appropriations Riders.

**1.**  As our opening brief explained, the Supplemental Guidance expressly invoked and is consistent with HHS's regulations governing deviation from negotiated indirect-cost rates.  Those regulations provide that although HHS components presumptively will adhere to negotiated rates for indirect costs, they also enjoy authority to deviate from those rates.

Specifically, "[a]n HHS awarding agency may use a rate different from the negotiated rate for a class of Federal awards or a single Federal award ... when approved by a Federal awarding agency head or delegate based on documented justification as described in paragraph (c)(3) of this section." 45 C.F.R. § 75.414(c)(1).  Paragraph (c)(3), in turn, requires only that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."  *Id.* § 75.414(c)(3); *cf.* 2 C.F.R. § 200.414(c) (similar).

14

That is what NIH did here. The agency invoked Section 75.414(c) and fulfilled its procedural obligations by issuing the Supplemental Guidance, which serves as NIH's "documented justification" containing the "policies, procedures and general decision making criteria" addressing and justifying its "deviation[] from negotiated rates." 45 C.F.R. § 75.414(c)(1), (3). The Supplemental Guidance announces NIH's updated "polic[y]" and offers its substantive "justification" for the new policy. *See* ADD.83-84; *see also* NIH Br. 10-13, 46-51; *infra* pp. 22-25. It identified the "decision making criteria" that NIH applied in selecting a standardized 15% rate for IHEs. And it addresses the "procedures" involved in that determination, including NIH's determination that the cap would apply only to go-forward expenses for current grants as of February 10, 2025.

Because it fulfilled those regulatory obligations, NIH also did not run afoul of the annual appropriations riders. Those riders principally state that "the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates"—*i.e.*, 45 C.F.R. § 75.414(c)—"shall continue to apply" now as they did in 2017. Pub. L. No. 118-47, div. D, tit. II, § 224, 138 Stat. 460, 677 (2024). The subsequent sentence of the rider supports that codification of the existing regulations by preventing HHS from using appropriated funds to

15

"develop or implement a modified approach" to 45 C.F.R. § 75.414(c) or to "intentionally or substantially expand the fiscal effect of the approval of ... deviations from negotiated rates." *Id.* Collectively, that language prevented HHS from amending its Part 75 regulations or reducing its total spending on NIH-funded research. But in promulgating the Supplemental Guidance, HHS has not purported to change its regulations; it has instead operated within the regulatory framework to which Congress directed adherence. Nor has NIH sought to reduce its total spending; on the contrary, it recognized that the Supplemental Guidance would "save more than $4B a year," J.A. 106, that could then be redirected to other direct research costs.

**2.** Plaintiffs' contrary arguments are unpersuasive. Plaintiffs repeatedly theorize that the regulations impose substantive constraints such that NIH may deviate from negotiated rates only in "limited circumstances" (States Br. 14) or for "narrow exceptions" (IHEs Br. 19). But the regulation nowhere specifies such "limit[ation]" or "narrow[ing]" at all. Certainly, the term "deviation" itself imposes no such restriction; a deviation is a "change from a customary or agreed-on course of action" that is "noticeabl[y] different[t] from what is expected." *Deviation*, Black's Law Dictionary (12th ed. 2024). Plaintiffs assert that a deviation cannot be too extreme, but offer no workable test for

discerning what kinds of deviation would or would not fall within the latitude that they concede the regulation allows.

The only substantive constraint plaintiffs actually identify is that a deviation must apply to a "class of Federal awards." 45 C.F.R. § 75.414(c)(1). Here, the Supplemental Guidance applies to one such class: for all current and future *NIH* grants *to IHEs*, it sets a standard indirect-cost reimbursement rate of 15%.[3] ADD.84. As earlier explained (NIH Br. 41-42), even a broader group of grants would still constitute a "class of Federal awards." Nothing in the regulatory definition limits the size of the "[c]lass" that may be adjusted. 45 C.F.R. § 75.2.

Plaintiffs' theory that the Supplemental Guidance is procedurally deficient fares no better. *Cf.* States Br. 45-46; IHEs Br. 39-40. As already explained (NIH Br. 40-41), nothing in Section 75.414(c)'s text expressly calls

---

[3] Although the Supplemental Guidance's opening paragraphs do not note that the 15% rate applies only to IHE recipients, *see* ADD.82, it expressly states that limitation in subsequent paragraphs, *see* ADD.84. The reason why it applies only to IHEs—and not to all recipients—is because some non-IHE recipients either do not receive any indirect-cost reimbursement or receive reimbursements at rates lower than 15%. *See, e.g.*, 45 C.F.R. § 75.414(c)(1)(ii) (setting indirect-cost rate of 8% on awards to certain foreign entities). Contrary to plaintiffs' suggestion (States Br. 44), NIH cannot "forfeit[]" the agency's intentions about how it would actually implement the Supplemental Guidance were it not enjoined, and NIH raised its interpretation to the district court (States Br. 45 n.20). The district court's mistaken belief that the Supplemental Guidance applies to "all grants" without qualification, *see, e.g.*, ADD.6, was thus in error.

for any multi-stage adjudicative process. Its focus is instead on making publicly available NIH's explanation for any departure from negotiated rates— which NIH did when setting out the policies, procedures, and criteria for its new approach, which will be implemented on a go-forward basis through application to grant payments to IHEs. Although NIH could certainly choose to provide for a step-by-step rate redetermination process if it wished, nothing in the regulation guarantees recipients any opportunity to litigate individual deviations.

As a fallback, plaintiffs assert that NIH's approach is inconsistent with the language of a neighboring provision, *see* 45 C.F.R. § 75.414(c)(4), but their argument proves too much. Of course, at the outset of grantmaking, NIH must "include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement" as they then exist. 45 C.F.R. § 75.414(c)(4). But that notice requirement does not purport to derogate from NIH's express authority under section 75.414(c)(1) and (3) to "deviat[e]" for "a class of Federal awards" at a later time.[4] Nothing in the text of section 75.414(c)(4) suggests the distinction that plaintiffs apparently assume: that subsequent

---

[4] Similarly, Appendix III provides that negotiated rates should govern "[e]xcept as provided in paragraph (c)(1) of § 75.414." 45 C.F.R. pt. 75, app. III, § C.7.a.

individualized deviations under section 75.414(c)(1) are permissible but that classwide deviations are not.

Plaintiffs' suggestion that a "one-size-fits-all" or "across-the-board cap" contradicts the governing regulations (IHEs Br. 1; States Br. 43) is particularly difficult to credit given that such caps have existed for decades. As plaintiffs recognize (States Br. 11 n.10), since 1991, HHS has uniformly capped the "administrative" component of indirect costs for IHEs at 26%. *See* 45 C.F.R. pt. 75, app. III, § C.8.a. The regulation's express authorization of deviations not only for a "single Federal award" but for a "class of Federal awards," 45 C.F.R. § 75.414(c)(1), is best read as preserving HHS's ability to impose the very sort of regulatory cap that has long existed.

Plaintiffs not only wrongly assert that NIH ignored required procedures but also misstate the government's arguments in this Court. NIH never "concede[d]" that it did not "even attempt to implement or publicize [any] 'procedures and decision making criteria.'" *Cf.* States Br. 46. On the contrary, NIH's consistent position has been that the Supplemental Guidance itself contains all the "procedures and decision making criteria" conceivably required by section 75.414(c)(3). We simply argued that "[n]o *further* procedures or criteria [were] necessary to implement [NIH's] uniform policy"

19

beyond what the Supplemental Guidance already provided.  NIH Br. 41 (emphasis added).

**3.**  The appropriations rider, in turn, provides no independent basis for overturning NIH's actions.  *See* IHEs Br. 30 (agreeing that the rider "direct[ed] the executive to continue following the regulations").  As explained, because NIH's actions complied with the governing regulations, they also complied with the appropriations riders that compel adherence to those regulations.

Plaintiffs' contrary arguments are again unpersuasive.  Plaintiffs characterize the rider as "limit[ing] NIH's ability to deviate" or as prohibiting "categorical caps on indirect cost reimbursements" (States Br. 14, 47), but nowhere identify any language in the rider that actually has that effect.  They observe that the rider prevents NIH from taking a "'modified approach'" to its regulations (States Br. 48), but that simply means that NIH must operate within the regulations rather than seeking to change them.

Plaintiffs also renew their mistaken argument that the Supplemental Guidance has impermissible "fiscal effects" (States Br. 49; IHEs Br. 30-31), but as we have explained, that language was simply reiterating Congress's instruction that NIH use all of its research funding rather than spend less on research costs than Congress had appropriated.  Their assertion that Congress—without saying so—intended its references to "fiscal effects" in a

government appropriations bill to instead address the budgeting processes of private institutions is simply implausible.[5]

Ultimately, instead of the rider's text, plaintiffs ask this Court to focus on real-world political "context" that they assert "informs the rider" (IHEs Br. 30), such that the rider could be understood to "impliedly" bar categorical caps (States Br. 47). Plaintiffs thus effectively concede that the rider's own text cannot sustain their argument. "[T]he text of a law controls over purported legislative intentions unmoored from any statutory text; the Court may not replace the actual text with speculation as to Congress's intent." *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024). Congress easily could "have chosen different language" expressly enacting the type of rider that plaintiffs envision. *Id.* at 823. Though plaintiffs assert that the rider was a reaction to the Executive Branch's 2017 proposal to statutorily cap

---

[5] Plaintiffs urge that "NIH is *already required* to spend all its appropriated funds" (IHEs Br. 32), but their cited statute (the Impoundment Control Act) says nothing about what an agency spends its money on, and so does not "render ... meaningless" (*id.*) the rider's more specific mandate that NIH not reduce its spending on medical research. And on its own terms, that Act does not unfailingly require an agency to spend all appropriated funds, but instead creates a process by which the Executive Branch can decline to do so—again leaving room for the rider's "fiscal effect" clause to operate as an override. *Cf.* 2 U.S.C. §§ 683-684. Moreover, Congress has excepted some NIH appropriations from the Impoundment Control Act. *See* 21st Century Cures Act, Pub. L. 114-255, §§ 1001(b)(3)(B), 1002(b)(3)(B), 1003(b)(3)(B), 1004(c), 130 Stat. 1033 (2016).

indirect-cost reimbursements (*cf.* IHEs Br. 33), and that certain congressional committees expressed opposition to that proposal on policy grounds (*cf.* States Br. 8), the fact remains that Congress did not actually enact any language prohibiting such deviations within the framework of existing regulation, whether on a standardized or individualized basis.

Finally, plaintiffs cannot change the meaning of the statute by invoking prior Executive Branch statements that they seek to portray as concessions. *Cf.* IHEs Br. 2, 11; States Br. 50. The statements plaintiffs cite were conclusory, failed to engage with the statutory text, and are entitled to no deference from this Court, which must "exercise independent judgment" in interpreting the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

## B. The Supplemental Guidance Is Reasonable And Reasonably Explained.

The Supplemental Guidance survives arbitrary-and-capricious review. "The scope of review under [that] standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA requires only that agency action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That requirement is minimal; a court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 513-14 (2009) (quotation marks omitted). And where, as here, the agency action reflects a change in policy, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515.

**1.** NIH satisfied those minimal burdens. *See* NIH Br. 45-51. The Supplemental Guidance sets forth the logic and factual basis underpinning NIH's decision to exercise its regulatory authority to deviate from negotiated indirect-cost rates. NIH explained that "administrative overhead" and other indirect costs, which are "difficult for NIH to oversee," have increasingly come to displace spending on direct medical research, diverting resources from NIH's core mission. ADD.83. NIH also concluded that it was appropriate to "ensure that as many funds as possible go towards direct scientific research costs" in light of its obligation to "carefully steward ... taxpayer dollars." *Id.* And NIH explained that this change would bring its grant policies more in line with other, private grantmaking institutions from which IHEs also "readily accept grants," but which do not typically provide indirect-cost reimbursement at anything approaching the much higher negotiated rates that NIH has since determined to be inappropriate. *Id.*

In so doing, NIH acknowledged that it was changing course and that this change would affect private interests. NIH expressed "cognizan[ce] that grant

recipients, particularly 'new or inexperienced organizations,'" have come to rely on NIH's funding of "indirect costs like overhead." ADD.83. But the Supplemental Guidance reflects the considered policy judgment that it is preferable to "ensure that as many [taxpayer] funds as possible go towards direct scientific research costs," even at the cost of impairing private interests that had come to rely on generous indirect-cost funding. *Id.*

**2.** Plaintiffs' response briefs highlight, at great length and in considerable detail, the significant extent to which they disagree with NIH's policy change. Those arguments do not, however, identify any legal defect in the Supplemental Guidance. When it comes to the wisdom *vel non* of an agency's announced policy, "reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

Plaintiffs fail to defend the district court's assertion that "NIH failed to provide any reasoning, rationale, or justification *at all*." ADD.32-33 (emphasis added). On the contrary, they acknowledge that NIH "listed three reasons" for its policy change. States Br. 11. Although NIH did not "elaborate further" (*id.*), under the APA, its identification of the reasons for taking action is enough. This Court must credit "any rationale that 'may reasonably be

discerned' from the agency's decision," not only those rationales plaintiffs agree are sufficiently thorough. *Diaz-Valdez v. Garland*, 122 F.4th 436, 443 (1st Cir. 2024) (quoting *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021)).

Plaintiffs do echo the district court's assertion that NIH impermissibly failed to explain how "research will be conducted absent the [higher] indirect cost reimbursements," ADD.33. But as already discussed (NIH Br. 49), nothing in the APA requires—or even allows—NIH to assume the intrusive function of instructing private universities about how best to obtain replacement funding, adjust their budgets, or to restructure their research operations. It is enough for NIH to acknowledge that IHEs had long been the beneficiaries of generous indirect-cost funding, but to conclude that a policy change is nevertheless warranted for rational reasons, as the agency did here.

## C. Plaintiffs' Remaining APA Challenges Are Without Merit.

The final two claims addressed by the district court—that the Supplemental Guidance required notice and comment and is impermissibly retroactive—are likewise meritless, and plaintiffs offer little to suggest otherwise. *See* NIH Br. 51-59.

**1.** The Supplemental Guidance did not require notice and comment. Section 553(a)(2) expressly exempts any "matter relating to ... grants, benefits, or contracts" from APA rulemaking procedures, 5 U.S.C. § 553(a)(2), and the

25

Supplemental Guidance indisputably concerns such matters.  Although HHS previously announced a policy of nonetheless voluntarily undertaking rulemaking, that policy was an internal matter that could not properly be enforced by a reviewing court.  "A court's role in reviewing an agency decision not to extend informal rulemaking procedures" is limited to ascertaining "whether the APA required such procedures."  *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1059 (5th Cir. 1985).  And to the extent there is any conflict between a statute and an agency's interpretive rule or policy statement, the statute necessarily controls.  *Cf., e.g.*, *United States v. Toth*, 33 F.4th 1, 11-15 (1st Cir. 2022) (holding that agency could impose higher penalty authorized by statute notwithstanding that agency's own interpretive rule suggested lower limit).  Contrary statements in the cases cited by plaintiffs (States Br. 51-52; IHEs Br. 49) are neither controlling nor persuasive.

As previously explained (NIH Br. 55), rulemaking procedures also were not required because the development of the standard 15% rate was an informal adjudication under HHS's existing regulations, which contemplate deviations on either a "single" or "class"-wide basis, 45 C.F.R. § 75.414(c)(1), in accordance with "procedures" developed by the agency itself, *id.* § 75.414(c)(3).  As already explained, plaintiffs' arguments that NIH failed to adhere to those procedural adjudicatory requirements are without merit.

Plaintiffs cannot get another bite at the apple by now arguing that the regulation is irrelevant and APA rulemaking should have been used instead. *See, e.g.*, *Molina v. INS*, 981 F.2d 14, 22-23 (1st Cir. 1992) ("[A]gencies have broad legal power to choose between adjudication and rulemaking proceedings as vehicles for policymaking."); *accord Wages & White Lion*, 145 S. Ct. at 915.

In all events, HHS has since rescinded its voluntary-rulemaking policy. *See* ADD.94.  As a result, any procedural error is harmless:  disturbing the Supplemental Guidance would serve no useful purpose because the agency could simply reimpose the same policy, and notice and comment would indisputably not be required.  Harmless-error review applies under the APA no less than in other areas of the law.  *See* 5 U.S.C. § 706.  And the government did not forfeit its right to harmless-error review; any effort to seek partial reconsideration of the district court's ruling would have done nothing to affect the outcome in district court.

**2.**  The Supplemental Guidance is not impermissibly retroactive. It applies only to "go forward expenses from February 10, 2025 forward," ADD.84, and expressly disavows any change for funds drawn prior to that date, *see id.*  Such a policy—adjusting the future stream of reimbursement a person may receive for future costs—is plainly prospective in character.  *See Martin v. Hadix*, 527 U.S. 343, 360 (1999) (finding no retroactivity problem in a

27

statute to the extent it provided that, "going forward," attorneys "will earn a lower hourly rate than [they] had earned in the past").

Of course, the Supplemental Guidance may have contradicted IHEs' assumptions about their likely future reimbursements. But, as a legal matter, an enactment "does not operate 'retrospectively' merely because it ... upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (citation omitted). Plaintiffs' arguments about prejudice from a midstream change in indirect-cost rates simply parallel the attorneys' arguments in *Martin*, which two dissenting justices found persuasive but the majority did not. *Cf. Martin*, 527 U.S. at 369-70 (Ginsburg, J., dissenting in relevant part) (lamenting that application of statute to pending cases would "significantly alter[] the consequences of the representation on which the lawyer has embarked").

The existence of negotiated indirect cost rate agreements (NICRAs) does not meaningfully distinguish this case. IHEs' purported rights under NICRAs have always been subject to the agency's regulatory authority under 45 C.F.R. § 75.414(c)(1) to depart from negotiated rates. Though recipient institutions may well have made plans in reliance on existing rate arrangements, and NIH's policy change may have "impaired the future value of past bargains," *National Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009),

28

those so-called "secondar[y] retroactiv[ity]" concerns are instead properly addressed under arbitrary-and-capricious review, *National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 158-59 (D.C. Cir. 2010).

Plaintiffs' retroactivity assertions are thus not only wrong but also simply underscore the contractual nature of this dispute. If plaintiffs truly believe that NIH has acted in a manner that has changed the "legal consequences [of completed] events," *Landgraf*, 511 U.S. at 270—*i.e.*, that the government has breached plaintiffs' contractual rights—the remedy they should pursue is the one that Congress has provided for such circumstances. *See supra* pp. 4-14. APA Section 702 does not allow them to bypass that remedy.

## CONCLUSION

The judgments should be vacated and remanded with instructions to dismiss, or alternatively, reversed on the merits.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRIAN C. LEA
  *Deputy Associate Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

COURTNEY L. DIXON
  */s/ Jeffrey E. Sandberg*

JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *jeffrey.e.sandberg@usdoj.gov*

  *Counsel for Defendants-Appellants*

JULY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,487 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg
*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2025, I electronically filed the foregoing reply brief with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg
*Counsel for Defendants-Appellants*